Bruce W. Akerly
Texas Bar No. 00953200
bakerly@canteyhanger.com
Perry J. Cockerell
Texas Bar No. 04462500
pcockerell@canteyhanger.com
CANTEY HANGER LLP
1999 Bryan Street, Suite 3330
Dallas, Texas 75201
Telephone: (214) 978-4129
Facsimile (214) 978-4150

PROPOSED ATTORNEYS FOR
THE DEBTORS-IN-POSSESSION

IN THE UNITED STATE BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | CASE NO. 10-47176 |
| | § | |
| REOSTAR ENERGY | § | |
| CORPORATION, ET AL., | § | (Chapter 11) |
| | § | |
| Debtors. | § | |
| | § | (Jointly Administered) |

**DEBTORS' EMERGENCY MOTION
TO PAY CERTAIN CRITICAL VENDORS**

Debtor REOSTAR ENERGY CORPORATION, together with its wholly owned affiliates (collectively, "**Debtors**")[1] files this *Emergency Motion to Establish Critical Vendor Payment Procedures*, as follows:

**Jurisdiction and Procedural Background**

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. The Motion concerns the administration of the estate; and therefore, it is a

---

[1] The Debtors in these chapter 11 cases are: ReoStar Energy Corporation, ReoStar Gathering, Inc., ReoStar Leasing, Inc., and ReoStar Operating, Inc.

**DEBTORS' EMERGENCY MOTION TO PAY CERTAIN CRITICAL VENDOR S– Page 1**

"core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. On November 1, 2010, (the "**Petition Date**"), the Debtors filed their individual voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtor individual chapter 11 cases were procedurally consolidated are proceeding under joint administration as styled and referenced above.

4. Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

## Statement of Facts

5. Debtors are related entities that are all engaged in the oil and gas business. ReoStar Energy is a Nevada corporation. ReoStar Gathering, ReoStar Leasing, and ReoStar Operating are Texas corporations.

6. ReoStar Energy is a publicly held company headquartered in Fort Worth, Texas that is engaged in the development and redevelopment of oil and gas fields in the United States. ReoStar Energy has proven reserves of approximately $180 Million. Assets include over 17,000 acres of mineral leasehold primarily located in Texas, and operational equipment, including service and drilling rigs.

7. ReoStar Energy is focused on generating revenue and profits from its oil and gas properties and building reserves through the acquisition of strategic leasehold interests. ReoStar Energy's success to date involves its ability to manage risk, control its operations, respond quickly to changes in market conditions, and adapt to technological innovation. ReoStar Energy has accomplished this through a corporate strategy that includes the integration of assets (i.e., assimilating drilling equipment, mineral leaseholds and operational experience into a seamless, efficient and low-cost operator-producer), continuation and increase in drilling activities (i.e.,

growing drilling operations in the both the Barnett Shale and Corsicana Field located in Texas), acquisition of additional mineral leaseholds (i.e., acquiring interests in its current areas of operation while also pursuing other acquisitions of unconventional gas resource plays in and around our existing infrastructure), application of enhanced completion techniques (i.e., applying enhanced methodologies to newly drilled wells in the Barnett Shale which includes utilizing "mighty acid" fracs in conjunction with a cluster drilling program), and continued application of enhanced oil recovery (EOR) technology (i.e., continue to advance EOR technology to stimulate oil and gas flow to produce remaining fluids that were not extracted from our mature oil fields during primary or secondary recovery phases).

8. The Debtor's business has been adversely impacted by the general economic downturn in the United States, which has caused the revenues of the hotel to be insufficient to cover all of the expenses of the Debtor.

### Relief Requested

9. In their day-to-day operations, the Debtors heavily rely on many suppliers and service providers. Like many companies in the oil and gas industry with operating wells, the Debtors rely on vendors such fuel providers, parts suppliers, and the like that are specialized and unique to the industry and enable them to operate and repair wells going forward. Because the Debtors' primary product is oil and gas production, they require a steady and certain line of fuel, parts and other items, as well services relating to well operations, that are required to permit Debtors' businesses to continue in operation.

10. The Debtors believe that the goods and services supplied by certain of their vendors are critical to operations in that their businesses, or some arm of their businesses, could not continue to operate without access to such goods and services. As of the Petition Date, many of the vendors deemed critical by the Debtors have outstanding claims against the

Debtors arising from prepetition deliveries of goods and prepetition performance of services. The Debtors anticipate they will be able to continue to transact with a majority of the vendors on which their day-to-day business operations depend despite non-payment by the Debtors of such vendors' prepetition claims. Non-payment of the prepetition claims of certain of the Debtors' vendors, however, creates a significant risk of disruption to the Debtors' operations. Thus, the Debtors anticipate there will be instances in which payment of the prepetition claims of certain vendors will benefit all creditors because such payment will allow the Debtors' businesses to avoid a likely loss, or to gain a likely economic advantage, disproportionate to the amount of such vendors' prepetition claims.

11. Accordingly, the Debtors request that the Court permit them to pay certain Critical Vendors (herein so-called). In exchange for payment by the Debtors of any Critical Vendor Claim (as defined below), the Debtors intend to require such Critical Vendors to agree to transact with the Debtors, for such duration of time as agreed between the Debtors and such Critical Vendor on Customary Trade Terms (as defined below), unless otherwise agreed by the Debtors and the Critical Vendor.

### The Critical Vendor Payment Procedures

12. The Debtors have undertaken an analysis of vendors who provide goods and services to the Debtors and, of those, which have outstanding claims against the Debtors as of the Petition Date. The Debtors then considered which of these vendors are critical to their ability to operate their businesses. In determining whether a vendor was "critical" to the Debtors' businesses, the Debtors applied the following according to the following criteria:

    (a)    Whether (i) the goods and services supplied by a particular vendor are essential to the continued operation of the Debtors' businesses or some arm thereof and cannot be obtained from any other vendor, or, could be obtained from another vendor only at such extra cost or at such delay as to outweigh the cost of paying the prepetition claim, or (ii) whether the vendor was in

possession of valuable property of the Debtors that is necessary to their ability to generate revenue;

(b) Whether the cost of paying the prepetition claim of such vendor, to the extent that such claim is fixed, noncontingent, liquidated, and undisputed (the "**Critical Vendor Claim**"), is outweighed by the benefit such payment is likely to secure on behalf of the Debtors' estates and other creditors; and

(c) Whether such vendor would likely continue doing business with the Debtors notwithstanding nonpayment of prepetition claims, such as those vendors subject to long-term, non-terminable contractual commitments.

13. According to the above criteria, the Debtors were able to identify a small group of vendors that the Debtors deem to be Critical Vendors. The Vendors, as well as the amounts, if any, due these Vendors pre-petition, are listed on **Exhibit "1"** hereto (referred to herein as either "**Obligations**" or "**Critical Vendor Obligations**"). These vendors provide goods and services to the Debtors necessary to permit the continued operation of Debtors' oil and gas wells and related businesses. Further, these Critical Vendors are necessary to enable the Debtors to retain the business of important customers and operator relations. Many of the Critical Vendors are either sole-source suppliers or are the only vendors able to meet the Debtors' requirements such that it would take weeks to months for the Debtors to find alternate suppliers or service providers. In addition, many of the Critical Vendors are small "mom and pop" type companies and any one payment by the Debtors represents a significant portion of their income.

14. The Debtors perceive a risk that, for certain of their Critical Vendors, a default by the Debtors would extinguish the Debtors' access to necessary goods and services, because (i) the vendor providing the particular good or service will be put out of business by the Debtors' nonpayment, (ii) because the vendor will refuse to continue doing business with the Debtors if its prepetition claim remains unpaid, or (iii) because the vendor may choose to continue doing business with the Debtors only upon the condition that the

Debtors provide trade term accommodations such as advance deposits or payment by wire transfer prior to delivery. Alternatively, the Debtors believe that vendors in possession of the Debtors' property may assert liens on such property and/or will not return such property to the Debtors in the ordinary course of business as long as their prepetition claims remain unpaid.

15. The Debtors anticipate that there may be instances in which the Debtors will require authority to pay the prepetition claim of a Critical Vendor that has refused to continue to deal with the Debtors, that is at risk of going out of business, or that has demanded trade tern accommodations the Debtors cannot meet, because the Debtors will be unable to operate their businesses or an arm thereof without the goods and supplies provided by such Critical Vendor. The Debtors feel they will not be able to fulfill their duty to their estates and creditors to preserve the value of their businesses without the authority to pay the prepetition claims of those vendors the Debtors have identified as Critical Vendors as and when such payments prove necessary.

16. Accordingly, the Debtors propose that they be permitted to pay Critical Vendor Claims, the payment of which the Debtors, upon advice of counsel, reasonably believe would be authorized under existing law. The Debtors shall file an accounting of each such claim paid, including the bases on which payment of such claim is warranted under existing law. Upon motion of any party in interest filed within thirty (30) days of such accounting, the Debtors (and the creditor paid) shall be required to show cause why payment of such claim should be deemed by the Court to be properly authorized. If the Court determines that a payment was not properly authorized, the Debtors are authorized to, in their discretion and without further order of the Court, declare that payments made to such Critical Vendor on account of its Critical Vendor Claims are deemed to have been in

payment of then-outstanding post-petition claims of such vendor without further order of the Court or action by any person or entity. In addition, such Critical Vendor shall immediately repay to the Debtors any payments made to it on account of its prepetition claim to the extent that the aggregate amount of such payments exceed the post-petition obligations then outstanding, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or otherwise.

17. As a prerequisite to payment of any Critical Vendor Claim, the Debtors intend to require Critical Vendors to agree to transact with the Debtors post-petition on Customary Trade Terms (as defined below) for such duration of time as agreed to by the Debtors and the particular Critical Vendor, unless otherwise agreed to by the Debtors and the particular Critical Vendor. "**Customary Trade Terms**" are those trade terms, which include, but are not limited to, credit terms, credit limits, historical pricing conventions, historical product volumes, cash discounts, timing of payments, allowances, rebates, normal product mix, and availability and other applicable terms and programs, acceptable to the Debtors, that were most favorable to the Debtors and in effect between such Critical Vendor and the Debtors at any time during the 12 month period preceding the Petition Date. If after receipt of payment for any Critical Vendor Claim, a Critical Vendor refuses to continue to provide product, supplies or services upon the Customary Trade Terms as agreed to with the Debtors, then the Debtors may (i) declare that any payment made to such Critical Vendor on account of its prepetition claim shall be deemed to have been in payment of then-outstanding post-petition claims of such Critical Vendor without further order of the Court or action by any person or entity; (ii) require that the Critical Vendor immediately repay to the Debtors any payments made to it on account of its prepetition claim, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or otherwise; and (iii) seek redress with the Court for failure to comply with the

Customary Trade Terms.

### Legal Argument in Support of Motion

18. Section 1107(a) of the Bankruptcy Code, which provides that a debtor in possession shall perform all the functions and duties of a trustee, contains an implied duty that a debtor in possession act as a fiduciary "to protect and preserve the estate, including an operating business's going-concern value," on behalf of the debtor's creditors and other parties in interest. *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).

19. Pursuant to section 105(a) of the Bankruptcy Code, "[t]he [C]ourt may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). The purpose of section 105(a) is to "assure the bankruptcy court's power to take whatever action is appropriate or necessary in aid of the exercise of its jurisdiction." COLLIER ON BANKRUPTCY ¶ 105.01 (15th ed. rev. 2007). Section 105(a) of the Bankruptcy Code thus empowers the Court to issue any order "necessary or appropriate" to allow a debtor in possession to fulfill its duty to preserve the going-concern value of the business, including an order authorizing payment in full or in part of certain prepetition claims of unsecured creditors prior to confirmation of a plan. *See CoServ*, 273 B.R. at 496-97; *see also In re Mirant Corp., et al.*, 296 B.R. 427, 429-30 (Bankr. N.D. Tex. 2003).

20. Courts have long recognized that payment of some categories of prepetition obligations outside the plan of reorganization is often necessary to realize the paramount goal of rehabilitation of the debtor. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175, 177 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.") (citation omitted); *see also In re Lehigh & New England Ry.*, 657 F.2d 570, 581 (3d Cir. 1981)

(noting that the "doctrine of necessity" permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid"); *In re Boston & ME. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to the debtor's continued operation); *CoServ*, 273 B.R. at 500 (permitting chapter 11 debtors to pay the claim of a prepetition general unsecured creditor in full because the "[d]ebtors very likely must deal with [such creditor] or risk harm to their estates or their going concern value").

21.   Courts routinely authorize pre-plan payment of prepetition unsecured claims when such claims are entitled to priority status under the Bankruptcy Code and it is reasonable to believe such payments will benefit the debtor's estate and creditors. *See, e.g., In re CEI Roofing*, 315 B.R. at 59-61. In *CEI Roofing the* court authorized payment of prepetition employee wage claims to the extent that such claims would have been entitled to priority status, and likely payment in full, at the time of plan confirmation, *see 11* U.S.C. § 503(a)(3), because early payment of the claims was "common sense" in that it prevented the debtors' employees from leaving and thus preserved their businesses. *CEI Roofing*, 315 S.R. at 61. Because claims entitled to priority status will likely be paid in full, courts frequently authorize early payment of priority status claims when such timing and early payment is intended to prevent some harm or to procure some benefit for the estate. *See id.* at 60-61 (stating that as long as higher priority creditors fail to timely object, authorization of early payment in full of priority claims does not trigger concerns of upsetting the priority scheme of the Bankruptcy Code nor of unfairly discriminating amongst general unsecured creditors); *see also CoServ*, 273 B.R. at 483 (implying that a bankruptcy court may authorize early payment of prepetition claims accorded priority treatment in instances where nonpayment could impair a debtor's ability to

operate); *Equalnet Conims. Corp.*, 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000) (stating that a court may authorize pre-plan payment of certain priority status claims, to the extent the Bankruptcy Code affords priority status to such claims, because "the need to pay these claims in an ordinary course of business time frame is simple common sense").

22. In addition, many courts have authorized chapter 11 debtors to make payment in full or in part of the prepetition claims of non-priority general unsecured creditors where necessary to preserve or enhance the value of the debtor's estate to the benefit of all creditors. *See, e.g., In re Just for Feet, Inc.*, 242 B.R. 821 (D. Del. 1999) (authorizing payment of certain critical trade vendors); *In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15 (M.D. Fla. 2005) (authorizing payment of amounts owing to certain critical vendors); *Mirant Corp.*, 296 B.R. at 429-30 (granting chapter 11 debtors authorization to pay prepetition claims of certain classes of "critical" vendors); *CoServ*, 273 B.R. at 497 (noting that "it is only logical that the bankruptcy court be able to use section 105(a) of the Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate").

23. The court in *CoSer* noted that there are occasions when a debtor in possession's duty to preserve the business "can only be fulfilled by the preplan satisfaction of a prepetition claim." 273 B.R. at 497. Rather, payment of prepetition claims is necessary, and may be authorized, whenever it is established that (1) it is critical the debtor deal with the claimant, (2) a failure to deal with the claimant risks probable harm or eliminates an economic advantage disproportionate to the amount of the claim, and (3) there is no practical or legal alternative to payment of the claim (the "**CoSer Test**"). Id. at 498. The *CoSer* court provided an illustrative list of situations where payment of prepetition obligations by a debtor in possession may be a necessary predicate to preservation of the business. For example, the court noted that "[c]laims may require payment to avoid loss of a license through the exercise of a jurisdiction's police

power." *Id.* at 497. In addition, prepetition warranty or refund claims of consumer customers fell into this category because, if not honored, they "could so harm the debtor's good will as to destroy its going concern value." *Id.* The court stated that, "like employees, the bankruptcy court cannot force consumers to deal with the debtor, nor is there any practical alternative to satisfying warranty or refund claims." *Id.* The court also noted that where "payment of a prepetition unsecured claim is the only means to effect a substantial enhancement of the estate ... payment would be justified." *Id.*

24. Advance proof of necessity of payment, however, is not required in every instance. *See Mirant Corp.*, 296 B.R. at 429; *In re Bombay Company, Inc., et al.*, Case No. 07-44084 (Bankr. N.D. Tex. 2007) [Docket No. 58]. The Mirant court recognized that a company operating in chapter 11, especially early in the case, is in a "precarious position," and that serious damage could occur to a debtor's business were a court to require advance proof that each payment of a prepetition claim outside a confirmed plan of reorganization was necessary within the meaning of the *CoSer*, 296 B.R. at 429. Thus, because it "[did] not wish [the] [d]ebtors' businesses seriously damaged by the delay required to satisfy the court that a particular creditor should be paid," the court granted the debtors general authority to pay the prepetition claims of critical vendors as necessary and established procedures substantially similar to those requested by the Debtors in these cases. *Id.* at 429-30.

25. In the present case, some of the Critical Vendor claims will be entitled to priority status as administrative expenses and likely payment in full pursuant to section 503(b)(9) of the Bankruptcy Code because such claims arise from the delivery of goods to the Debtors, in the ordinary course of business, within the 20-day period preceding the Commencement Date. Section 503(b)(9) provides that:

> After notice and a hearing, there shall be allowed administrative expenses,

> other than claims allowed under section 502(f) of this title, including
>
> > (9) the value of any goods received by the debtor within 20 days before the date of commencement of a case under [title 11] in which the goods have been sold to the debtor in the ordinary course of such debtor's business.

11 U.S.C. § 503(b)(9). The Debtors submit that many of the Critical Vendor Claims arise from the delivery of goods to the Debtors in the ordinary course of business within the 20-day period preceding the Commencement Date. As such, these Critical Vendor Claims would likely be entitled to administrative expense status and to payment in full ahead of general unsecured creditors. Therefore, like payments to the debtors' employees in *CEI Roofing*, authorization of payment of many of the Critical Vendor Claims would not unfairly discriminate against the Debtors' other unsecured creditors and raises merely an issue of timing.

26.  Establishment of a process to pay claim of Critical Vendors is warranted. The claims involved total less than $15,000. The process proposed by Debtors will allow the Debtors to pay the Critical Vendor Claims, many of which will likely be entitled to priority administrative expense status pursuant to Bankruptcy Code section 503(b)(9), as necessary to protect the interests of the Debtors' estates. The Critical Vendor Payment Procedures will also ensure that no Critical Vendor holds the Debtors hostage and unreasonably demands payment of their prepetition claims. The Debtors believe that authority, but not direction, to pay the Critical Vendor Claims as such payments become necessary is crucial for the Debtors' seamless transition into chapter 11, will avoid immediate and irreparable harm, and will serve the best interests of the Debtors, their estates, and their creditors.

27.  The Critical Vendor Payment Procedures, or similar procedures granting general authority to pay prepetition claims of general unsecured creditors as necessary, have been authorized in this district for the payment of prepetition critical vendor claims. *See, e.g., In re Pilgrim's Pride, et al.*, Case No. 08-45664 (DML) (Bankr. N.D. Tex. 2010) [Docket No. 78]; *In*

*re Mirant Corp., et al.,* Case No. 03-46590 (DML) (Bankr. N.D. Tex. July 16, 2003) [Docket No. 32] (order establishing procedures to pay "critical" vendors); *In re Bombay Company, Inc., et al.,* Case No. 07-44084 (Bankr. N.D. Tex. Sept. 20, 2007) [Docket No. 58] (interim order establishing *Mirant* procedures). Courts in other jurisdictions similarly authorize debtors to pay critical vendor claims where essential to the debtors' continued operation. *See, e.g., In re Syntax-Brillian Corp., et al.,* Case No. 08-11407 (BLS) (Banks. D. Del. July 9, 2008) [Docket No. 50]; *In re JHT Holdings, Inc., et al.,* Case No. 08-11267 (BLS) (Bankr. D. Del. June 25, 2008) [Docket No. *48];* *In re American Home Mortgage Holdings, Inc.,* Case No. 07-11047 (CSS) (Bankr. D. Del. Aug. 7, 2007) [Docket No. *64]; In re Werner Holding Co. (DE) Inc., et al.,* Case No. 06-10578 (KJC) (Bankr. D. Del. June 13, 2006) [Docket No. *54]; In re Pliant Corp., et al.,* Case No. 06-10001 (MFW) (Bankr. D. Del. Jan. 4, 2006) [Docket No. *26]; In re Meridian Auto. Sys.-Composite Operations, et al.,* Case No. 05-11168 (MFW) (Bankr. D. Del. May 27, 2005) [Docket No. 183]; *In re Maxide Acquisitions, Inc., et al.,* Case No. 05-10429 (MFW) (Bankr. D. Del. Feb. 15, 2005) [Docket No. 33].

28. Based on the foregoing, the Debtors submit the relief requested is necessary and appropriate, is in the best interests of their estates and creditors, and should be granted.

### Request for Authority for Banks to Honor and Pay Checks/EFTs to Critical Vendors

29. The Debtors further request that the Court authorize and direct all applicable banks and other financial institutions to receive, process, honor and pay any and all checks drawn or electronic funds transferred to pay Critical Vendor Claims, whether such checks were presented prior to or after the Commencement Date; provided, however, that such checks or electronic transfers are identified by the Debtors as relating directly to the authorized payment of the Critical Vendor Claims. The Debtors also seek authority to issue new post-petition checks, or

effect new electronic fund transfers, on account of such claims to replace any prepetition checks or electronic fund transfer requests that may be dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

### Waiver of Bankruptcy Rules 6004(a) and (h)

30. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Reservation of Rights

31. Nothing contained herein is intended or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently. Finally, the relief requested herein shall not oblige the Debtors to accept any services, to accept the shipment of goods, or prevent the Debtors from returning or rejecting goods.

### No Previous Request

32. No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: November 12, 2010.  Respectfully submitted,

                                      **CANTEY HANGER LLP**

                                      By: /s/ Bruce W. Akerly
                                            Bruce W. Akerly
                                            Texas Bar No. 00953200
                                            Perry J. Cockerell
                                            Texas Bar No. 04462500

                                    1999 Bryan Street, Suite 3330
                                    Dallas, Texas 75201
                                    (214) 978-4129 Telephone
                                    (214) 978-4150 Facsimile

                                    PROPOSED ATTORNEYS FOR THE
                                    DEBTORS-IN-POSSESSION

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing document was served by electronic submission through the Court's automated Case Management and Electronic Docketing System for the U. S. Bankruptcy Court for the Northern District of Texas, Fort Worth Division and/or by first class mail, postage prepaid, to those parties-in-interest entitled to be served with same and, specifically, by facsimile and/or electronic mail, to the following person/entities on this the 12th day of November, 2010:

**Counsel for BT and MK Energy Commodities, LLC**

David S. Elder, Esq.
Gardere Wynne Sewell LLP
1000 Louisiana, Suite 3400
Houston, Texas 77002

**United States Trustee**

William T. Neary
United States Trustee
Earle Cabell Federal Building
Room 976
Dallas, Texas 75242

/s/ Bruce W. Akerly
Bruce W. Akerly

# RSO TRADE PARTNERS

ReoStar Operating Critical Vendor List
Pre-Petition Balances due
As of 11/09/10

| BAL DUE | NAME | ADDRESS | CITY | ST | ZIP |
|---|---|---|---|---|---|
| $ 188.23 | AIRGAS SOUTHWEST, INC. | P O BOX 676031 | DALLAS | TX | 75267 |
| 431.57 | CORSICANA NAPA AUTO PARTS | 401 N BEATON | CORSICANA | TX | 75110 |
| 126.67 | CORSICANA WINNELSON, INC. | P O BOX 1112 | CORSICANA | TX | 75151 |
| 895.00 | J. V. DOCKERY, INC. | P O BOX 57 | KERENS | TX | 75144 |
| 460.29 | ELLIOTT ELECTRIC SUPPLY | P O BOX 630610 | NACOGDOCHES | TX | 75963 |
| 1,253.61 | HAYNIE DRILLING CO., INC. | P O BOX 1061 | CORSICANA | TX | 75151 |
| 4,109.88 | KING MART | 2050 E HWY 31 | CORSICANA | TX | 75110 |
| 1,330.79 | NELSON-PUTMAN PROPANE GAS | P O BOX 776 | ENNIS | TX | 75120 |
| 3,056.10 | OIL CITY SUPPLY COMPANY | P O BOX 670 | OIL CITY | LA | 71061 |
| 430.23 | STEPHANIE PITZ | 609 N FORDYCE | BLOOMING GROVE | TX | 76626 |
| 1,047.27 | PURVIS INDUSTRIES, LTD. | P O BOX 540757 | DALLAS | TX | 75354 |
| 339.80 | TIM'S TIRES & WHEELS | 417 N 9TH STREET | CORSICANA | TX | 75110 |
| $ 13,669.44 | Total | | | | |

EXHIBIT "1"