Bruce W. Akerly
Texas State Bar No. 00953200
bakerly@canteyhanger.com
Perry J. Cockerell
Texas State Bar No. 04462500
pcockerell@canteyhanger.com
CANTEY HANGER LLP
1999 Bryan Street, Suite 3330
Dallas, Texas 75201
Telephone: (214) 978-4129
Facsimile: (214) 978-4150

ATTORNEYS FOR THE DEBTORS-IN-POSSESSION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | CASE NO. 10-47176 |
| | § | |
| REOSTAR ENERGY CORPORATION, | § | (Chapter 11) |
| ET Al., | § | |
| | § | |
| Debtors. | § | (Jointly Administered) |

**EMERGENCY MOTION FOR EXTENSION OF
EXCLUSIVITY AND CONTINUED USE OF CASH COLLATERAL**

REOSTAR ENERGY CORPORATION and its affiliated debtors (collectively, the "**Debtors**"), as debtors and debtors-in-possession, file this *Motion for Extension of Exclusivity and Continued Use of Cash Collateral* ("**Motion**") pursuant to section 1121(d) of title 11, United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), as follows:

**Introduction**

1. Debtors filed these jointly administered bankruptcy cases on November 2, 2010 (the "**Case**").

2. In this Motion, Debtors seek approval from the Court for an extension of exclusivity to allow Debtors to propose and solicit acceptances to a plan of reorganization, as

well as continued use of cash collateral, *nunc pro tunc*, to February 3, 2011. The Case has been pending less than 120 days while the Debtors have worked to stabilize the Debtor from a pending foreclosure of valuable assets by an alleged secured creditor with a substantial equity cushion.

2. Since the filing of the Case, Debtors have been operating their businesses in the ordinary course pursuant to agreements permitting the use of cash collateral belonging to the alleged secured creditor. The most recent allowance for use of cash collateral technically expired on February 3, 2011. (*See* Dkt. No. 73. *See also* Dkt. No. 4 (original motion to use cash collateral)).

3. On December 30, 2010, the Court, concerned about operational losses and the ability of Debtors to reorganize, directed that an Examiner be appointed to investigate Debtors' assets and business affairs and report to the Court. On January 10, 2011, the Court appointed Michael McConnell as the Examiner in this Case. *See* Dkt. No. 78. The Court requested that the Examiner file his report of investigation on or before February 10, 2011. On February 10, 2011, the Examiner filed his *Statement of Investigation, Michael A. McConnell, Examiner* in this Case. (Dkt. No. 93).

4. During the period of time the Examiner was conducting his investigation and issue his report, Debtors continued to operate their businesses and take steps toward possible sale of assets and reorganization of their business and financial affairs.

5. Because the Case has been in somewhat of a holding pattern while everyone awaited the Examiner's report, and given certain finding/conclusions of the Examiner, and given the efforts of Debtors to date to market their assets and facilitate possible reorganization of their principal business and financial affairs, Debtors require additional time to formulate a plan of reorganization along with accompanying disclosure statements, and circulate such plan or

plans to solicit acceptances taking into consideration Debtors' best business judgment and the Examiner's report. The Debtors, accordingly, seek an extension of the existing periods during which they may propose a plan or plans of reorganization (which date expires February 28, 2011) for not less than ninety (90) days.

### Jurisdiction/Venue

6. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The relief requested in the Motion is authorized under section 1121(d) of the Bankruptcy Code, Rule 3016(b) of the Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rule 3016.1.

### Background Facts

7. Debtors are related entities who are engaged in generating revenue and profits from its oil and gas properties and building reserves through the acquisition of strategic leasehold interests in the Corsicana and Barnett Shale areas.

8. ReoStar Energy was founded in 2007 by M.O. "Trey" Rife III whose family has been in the oil business for three generations. ReoStar Gathering, ReoStar Leasing, and ReoStar Operating are Texas corporations and are wholly-owned affiliates of ReoStar Energy. This bankruptcy was filed to prevent the foreclosure of assets by MK Energy and Commodities, LLC ("**BTMK**") who acquired the debt formerly held by Union Bank in the amount of $25,000,000. The debt is secured by Deeds of Trust, Security Agreements, Financing Statements, and Assignment of Production, ("**Deed of Trust**"), Guaranty Agreements (executed on behalf of ReoStar Gathering, ReoStar Leasing, and ReoStar Operating) and other collateral instruments that were executed in favor of Union Bank in 2008.

9. In early 2010, ReoStar Energy and its affiliates were experiencing cash flow issues. ReoStar began exploring options to restructure its business and/or financial obligations. ReoStar was introduced to BancTrust and Company ("**BT**") by and through certain of ReoStar Energy's foreign shareholders and board of director members as a potential buyer of the operating assets of ReoStar and its affiliate entities, thereby allowing ReoStar Energy and its affiliates to get out from under the indebtedness owing to Union Bank. BT indicated it was desirous of acquiring at least 80% ownership of ReoStar and its affiliates. BT signed a letter of intent and non-disclosure agreement. BT sent not less than twelve (12) engineers and attorneys to ReoStar Energy's offices to conduct due diligence. ReoStar turned over everything it owned, including confidential geological information, to BT to facilitate its due diligence examination. BT also understood that ReoStar Energy owed Union Bank approximately $10.5M at the time; however, it was not interested in what ReoStar Energy owed Union Bank because it was interested in acquiring a majority ownership in the companies. Instead, BT formed a relationship with the Michael Kenwood Group ("**MK**"), a private equity firm. BT and MK joined forces and created BTMK.

10. Without ReoStar Energy's knowledge, BTMK, with the knowledge and information gained by BT's through its supposedly private and confidential due diligence investigation of ReoStar Energy, commenced direct negotiations with Union Bank to acquire the Note, which was secured by a lien on substantially all of ReoStar Energy's assets. In June or July 2010, ReoStar Energy fell into monetary default under the Note. It began negotiations with Union Bank toward a possible restructure of the indebtedness.

11. In August 2010, ReoStar Entergy learned that BTMK acquired the Note from Union Bank at an approximate 50% discount. The Note and relating transactional instruments

and rights relating thereto and thereunder, including the Deed of Trust, were acquired by BTMK through a purchase, sale, and assignment transaction that closed in or around August 14, 2010. The Note was acquired by BTMK for approximately $5.4 million, significantly less than the face value of the Credit Agreement and well under the amount outstanding on the Note at the time ($12 million plus accrued interest). BTMK started immediately pushing for payment of the Note, which by this time ReoStar was in both covenant and monetary default.

12. Within weeks of the closing on the acquisition of the Note, the communications between ReoStar and BTMK ceased. On October 1, 2010, BTMK (having held the Note less than 2 months) accelerated the indebtedness owing by ReoStar under the Note. By letter dated October 12, 2010, BTMK provided notice to ReoStar that it had posted the real property securing repayment of the Note and other collateral for foreclosure on November 2, 2010. By letter dated October 22, 2010, BTMK made demand on certain entities to forward all proceed derived from the sale of oil and gas covered by its Deeds of Trust and assignment of production. When Debtors were unable to gain resolution of their financial issues with BTMK, Debtors contacted Bruce Akerly with Cantey Hanger LLP for representation and for possible bankruptcy filing in order to prevent foreclosure of the Deed of Trust with BTMK.

13. Since filing bankruptcy, Debtors have been actively pursuing opportunities to reorganize. The efforts have included entertaining offers to purchase existing assets as well as offers to inject capital into Debtors existing operations in an effort to permit Debtors to reorganize its business affairs and gain the full value of its holdings in the Barnett Shale region of Texas.

14. From December 30, 2011 through February 10, 2011, the Examiner conducted his examination of the estate through meetings with individuals as stated in his report. As

mentioned above, the case has been on hold while the parties waited for the Examiner's report. The Debtors have continued to negotiate with the largest alleged lien creditor for the use of cash collateral and the best ways to market the assets in this case.

15. In his report, the Examiner made the following significant findings/statements/conclusions:

- Regarding the account receivable/payable issues with Rife Energy:
    - "[T]hese accounts have been the subject of a long reconciliation process. The net receivable to ReoStar is a valuable asset which should be collected as soon as possible. Negotiations have been ongoing to reconcile these two accounts and the parties have advised the Examiner that they have reached an agreement in principle on the reconciliation which they will reduce to writing and present to the court for approval." (Examiner Report at 6). This is correct.

- Regarding the value of Debtors' Barnett Shale assets:
    - "The present reserve reports, however, do not appear to recognize the value of potential development of the Cooke County properties. No one has attempted to place a value on this potential value for ReoStar and its creditors but the potential appears to be real if capital can be found for development of oil production." (Examiner Report at 9).
    - "Both EOG and Conoco are obvious candidates as buyers for the ReoStar Barnett Shale properties but typically will want 100% of the working interest and will want to operate the wells themselves. This is a limitation because ReoStar does not own all of the working interests in the wells and the other interest owners will have to consent before 100% of the working interest can be transferred. The Joint Operating Agreement with Rife Energy Operating will also have to be terminated if EOG or Conoco purchase the properties. In this connection, Mr. Bennett has indicated that, despite the loss of future revenue, Rife Energy Operating will not stand in the way of a sale favorable to ReoStar and its creditors." (Examiner Report at 9-10).
    - "The ReoStar Barnett Shale properties have not been marketed under any formal sale process. In order to fully assess the market potential for the properties, a formal marketing process should be conducted under the guidance of a professional. This process, after an initial engineering study, should take between 90 – 120 days to fully test the market potential. Of course, Venro or ConocoPhillips could serve as a "staking horse" with adequate buyer protections in such a process." (Examiner Report at 10).
    - "Conoco Phillips/Burlington Resources has also been investigating the possibility of making an offer for the ReoStar Barnett Shale properties and is "walking" it through the internal review process. The process is nearly complete and ReoStar should know within the next ten days [February 20] if an offer will be

made. Any offer will be subject to acquiring 100% of the working interest and replacement of Rife Energy as the operator." (Examiner Report at 10).

- Regarding the Ford well property and offer from EOG:
"This transaction can and should be accomplished independently of any larger sale activity." (Examiner Report 12).

It is clear from his report that the Examiner believes that the value of certain assets of the Debtors will be maximized through a sale unless Debtors can demonstrate that someone is willing to inject significant capital into Debtors' business operations to enable Debtor to realize the full potential of its Barnett Shale assets. (Examiner Report at 12 - The assets "must either be sold or there must be a substantial equity infusion from third-parties . . . the most viable option is a sale of assets."). Further, the Examiner states that he is "unaware of any current formal recapitalization proposal. In the absence of any current recapitalization proposal, the most viable option is a sale of assets. First, the offer to purchase the ReoStar interest in the Ford No. 1 well should be acted upon immediately. Second, the Corsicana properties should be marketed independent of any sale process for the Barnett Shale properties, although this would not foreclose a combined sale if it ripened. Third, a formal marketing process for the Barnett Shale properties should begin promptly to adequately test the market for the ReoStar Barnett Shale properties." (Examiner Report at 12-13).

16. **Ford Well Property**. Debtors have received a formal offer to purchase approximately 140 acres of property on which Debtor ReoStar Energy has an interest in Ford No. 1 well from EOG Resources, Inc. ("**EOG**"). Debtor ReoStar Energy has responded to the offer with a counter proposal.

17. **Corsicana Property/Assets.** The Examiner concluded that the Corsicana properties should be marketed independent of any sale process for the Barnett Shale properties. Debtors agree. Debtors have been undertaking efforts to gain a buyer or buyer of its Corsicana

assets. The Corsicana field is quite old and involves a intricate amount of historical leases and other issues, including one pending lawsuit involving a lease dispute. (See Dkt. No. ____). The history of the Corsican fields/property has made it more difficult to market. However, Debtors have received a significant level of interest in acquiring the Corsicana fields from at least two entities, which have already undertaken some level of due diligence toward formulating a specific offer to Debtors.

18. **Barnett Shale Property/Assets**. The Examiner, as well as Debtors, concluded that the Debtors' Barnett Shale holdings (exclusive of the Ford well property discussed above) is its most valuable asset. The Examiner believes this asset is worth more than what BTMK believes it is worth. BTMK has not undertaken any attempt to evaluate the "true" value of this resource and continues to undervalue this asset, for obvious reasons. The Examiner concludes in his report that a formal marketing process of the Barnett Shale properties should begin promptly to adequately test the market for the ReoStar Barnett Shale properties. In this regard, the Examiner concluded that in "order to fully assess the market potential for the properties, a formal marketing process should be conducted under the guidance of a professional. This process after an initial engineering study, should take between 90 – 120 days to full test the market potential." (Examiner Report at 10. Debtors have already begun the process of marketing the Barnett Shale asset. Debtors have already received the Venro proposal for the assets; however, for reasons noted by the Examiner in his report, Debtors believe this offer is below current market value for the assets. Venro is still very much interested in participating in a purchase of the Barnett Shale assets and/or providing an equity infusion to ReoStar. Conoco Phillips has completed its analysis for Debtors' Barnett Shale properties and has indicated by email that an offer should arrive shortly. However, Conoco Phillips offer will likely require that they receive 100% of the

working interest in the properties. The complexity of the current working interest holdings in the Barnett Shale, many of which are not under the control of Debtors, will necessitate and require additional time to make sure that they will transfer their interests should a sale take place to Conoco Phillips or another entity wanting 100% of the working interests. Debtors have also recently received several inquiries from equity investment firms seeking information as to whether and to what extent they may offer capital to ReoStar Energy to facilitate a reorganization of its business and financial affairs going forward. These offers are in the infant stage and <u>will</u> require additional time to consider and evaluate.

19. **Exclusivity**. As of the filing of the Case, pursuant to subsections 1121(b) and (c)(3) of the Bankruptcy Code, the Debtors had: (a) 120 days after the Petition Dates within which to file their plans of reorganization (the "**Filing Period**"); and (b) 180 days after the Petition Dates within which to solicit acceptances of those timely- filed plans (the "**Solicitation Period**" and together with the Filing Period, the "**Exclusivity Periods.**") before other parties-in-interest were permitted to file plans. The initial Filing Period and the initial Solicitation Period expires on March 1, 2011.

20. **Local Rule 3016.1 Report**. In addition to the foregoing, Debtors report that they believe it likely that they will be in a position to file a plan and disclosure statement in the Case within 90 days from the expiration of the current Exclusive Periods. This Case was filed during the winter months when it was unlikely that a purchaser could be located or accomplished. However, as noted above, several interest purchasers have appeared such that one or two could become stalking horses for the potential sale of the assets. Adequate time is needed so that one potential offer, which includes contingencies, can be met.

## Relief Requested

21. Based on the foregoing, pursuant to section 1121(d) of the Bankruptcy Code, the Debtors seek the entry of an order further extending the Exclusivity Periods under sections 1121(b) and (c) of the Bankruptcy Code to file and solicit chapter 11 plans to not less than May 30, 2011. Debtors further request that they be entitled to use cash collateral during this period on the same conditions as currently exist, *nunc pro tunc*, to February 1, 2011.

## Discussion

22. Section 1121(b) of the Bankruptcy Code provides for an initial period of 120 days after the commencement of a chapter 11 case during which a debtor has the exclusive right to file a chapter 11 plan. Section 1121(c)(3) of the Bankruptcy Code provides that if the debtor proposes a plan within the 120-day exclusive period, it has a period of 180 days after the commencement of the chapter 11 case to obtain acceptances of such plan.

23. Pursuant to section 1121(d) of the Bankruptcy Code, the Court may, upon a demonstration of cause, extend a debtor's Exclusivity Periods. As demonstrated below, cause exists for extending the Debtors' Exclusivity Periods.

24. The paramount objectives of a chapter 11 case are the rehabilitation of a debtor's business and the negotiation, development, proposal, confirmation and consummation of a chapter 11 plan. The Exclusivity Periods under section 1121 of the Bankruptcy Code were intended to afford a debtor a full and fair opportunity to achieve these objectives without the disruption of its business that might be caused by the filing of competing plans.

25. Section 1121(d) of the Bankruptcy Code permits the Court to extend a debtor's Exclusivity Periods upon a demonstration of cause:

> (d) On request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after

notice and a hearing, the court may for cause reduce or increase the 120 day period or the 180-day period referred to in this section.

11 U.S.C. § 1121(d).

26. "The hallmark of ... section [1121(d)] is flexibility." *In re Perkins,* 71 B.R. 294, 297 (W.D. Tenn. 1987). Congress intended that the period during which only the debtor may file a chapter 11 plan be of adequate length for the debtor to formulate, negotiate and draft a consensual plan and solicit acceptances thereof. As is reflected in the legislative history of section 1121 of the Bankruptcy Code, section 1121(d) "allows the flexibility in individual cases" to extend the Exclusivity Periods "to allow the debtor to reach an agreement" H.R. Rep. No. 595, 95th Cong., 1st Sess. 232 (1977); *see In re Newark Airport/Hotel L.P.,* 156 B.R. 444, 451 (Bankr. D.N.J. 1993), *aff'd,* 155 B.R. 93 (D.N.J. 1993); *In re Publicسen. Co. of New Hampshire,* 88 B.R. 521, 534 (Bankr. D.N.H. 1988) ("the legislative intent [is] to promote maximum flexibility").

27. In circumstances where the initial Exclusivity Periods prove inadequate for the debtor to negotiate and file a plan, the bankruptcy court has the discretion to, and in the context of large chapter 11 cases, routinely does, extend the debtor's Exclusivity Periods for substantial periods of time. In determining whether cause exists to extend a debtor's exclusivity periods, courts generally consider whether:

    (a)    the debtor's case is sizable and complex;
    (b)    there is good faith progress towards rehabilitation and the development of a consensual plan of reorganization;
    (c)    the debtor is seeking to use the exclusivity periods to pressure creditors into accepting a plan of reorganization; and
    (d)    the debtor is generally making required postpetition payments as they come due and is effectively managing its business and preserving the value of its assets.

*See In re McLean Indus., Inc.,* 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987); *In re Express One Intern, Int'l, Inc.,* 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996); and *In re United Press Mt?,*

*Inc.,* 60 B.R. 265, 269 (Bankr. D.D.C. 1986). Cause may also include instances where there is recalcitrance among the creditors and where there is a major obstacle in the path of a successful reorganization, such as an acrimonious relationship among the principal parties. *See Texas Extrusion Corp.* v. *Palmer, Palmer, & Coffee (In re Texas Extrusion Corp),* 68 B.R. 712, 725 (N.D. Tex. 1986), *(did* 844 F.2d 1142 (5th Cir. 1988).

28. The legislative history of section 1121 notes that "if an unusually large company were to seek reorganization under chapter 11, the court would probably need to extend the time in order to allow the debtor to reach an agreement." H.R. Rep. No. 595, 95th Cong., 2d Sess. 231-32 (1978) (footnotes omitted). The legislative history has been interpreted as a virtual mandate for extension in unusually large cases, and courts have routinely granted extensions in such cases. The facts and circumstances of these cases and the express terms of section 1121(d) amply support the extension of the Exclusivity Periods requested herein. *See Express One Int'l, Inc.,* 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996) (large size of debtor and concomitant difficulty *in formulating a plan of reorganization are traditional grounds for extension);* In re Pine Run Trust, Inc., *67 B.R. 432, 435 (Bankr. E.D. Pa. 1986) ("Nile traditional ground for cause [is] the large size of the debtor and the concomitant difficulty in formulating a plan of* reorganization...").

29. Bankruptcy courts routinely allow debtors in large, complex cases multiple extensions of the Exclusivity Periods. *See In re Hollinger Industries, Inc.,* 292 B.R. 639 (8th Cir. BAP 2003) (granting a third extension of the exclusive period for five months, resulting in a total extension of approximately 360 days); *In re Global Crossings,* 295 B.R. 726 (Bankr. S.D.N.Y. 2003) (granting a second extension of the exclusive period for a period of five months, resulting in a total extension of approximately 240 days).

30. The Debtors believe that ample cause exists to support the requested extensions. Debtors have not been dilatory in their attempts to market the properties at issue and to gain reorganization for the benefit of all creditors. This is Debtors first request for an extension of exclusivity and it parallels recommendations of the Examiner.

31. Extensions of a debtor's exclusivity period to file a plan and the period to solicit acceptances for such plan are justified by progress in the resolution of issues facing the debtor's estate. *See, e.g., In re Service Merchandise, Inc.,* 256 B.R. 744, 753-54 (M.D. Tenn. 2000); *In re Alnico Plastics, Inc.,* 197 B.R. 74, 77 (Bankr. S.D. Ohio 1996); *In re McLean Indus. Inc.,* 87 B.R. 830, 835 (Bankr. S.D.N.Y. 1987); and *In re Texaco, Inc.,* 76 B.R. 322, 327 (Bankr. S.D.N.Y. 1987). The Debtors are making progress in securing a stalking horse for the sale of assets.

32. Accordingly, Debtors should be afforded a full and fair opportunity to negotiate, propose, and seek acceptance of a chapter 11 plan. The Debtors believe that the requested extension of the Exclusivity Periods is warranted and appropriate under the circumstances. The Debtors submit that the requested extension is realistic and necessary; will not prejudice the legitimate interest of creditors and other parties-in-interest; and will afford the Debtors a meaningful opportunity to pursue a feasible business plan and a consensual plan of reorganization, all as contemplated by chapter 11 of the Bankruptcy Code. Debtors further believe that an extension of their use of BTMK's cash collateral during the extension of exclusivity is warranted under the circumstances.

**WHEREFORE,** the Debtors respectfully request that the Court grant this motion and issue and order: (a) extending the Exclusivity Periods within which the Debtors can file a plan or plans of reorganization through May 30, 2011, and thereafter to solicit acceptances thereof; (b) that Debtors' use of cash collateral be extended on the same conditions as heretofore

granted; and (b) that Debtors be granted such other relief that is consistent with the foregoing.

Dated: February 14, 2011

        Respectfully submitted,

        CANTEY HANGER LLP

        By: /s/ *Bruce W. Akerly*
            Texas Bar No. 00953200

           1999 Bryan Street, Suite 3330
           Dallas, Texas 75201
           Telephone: (214) 978-4129
           Facsimile: (214) 978-4150

        ATTORNEYS FOR DEBTORS-IN-POSSESSION

## **CERTIFICATE OF CONFERENCE**

The undersigned certifies that he has tried to reach an agreement with counsel for BTMK regarding the relief requested in the instant motion. An agreement has not been reached. Accordingly, the matter is submitted to the Court for determination.

           /s/ Bruce W. Akerly
           Bruce W. Akerly

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing document was served by electronic submission and/or first class mail, postage prepaid, to those persons or entities entitled to received same and, specifically, to the following person/entities on this the 14th day of February 2011:

**Counsel for BT and MK Energy Commodities, LLC**

David S. Elder, Esq.
Gardere Wynne Sewell LLP
1000 Louisiana, Suite 3400
Houston, Texas 77002

**United States Trustee**

William T. Neary
United States Trustee
Meredyth A. Kippes
Trial Attorney – Office of the United States Trustee
Earle Cabell Federal Building
Room 976
Dallas, Texas 75242

/s/ *Bruce W. Akerly*
Bruce W. Akerly